# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 1, 2008

Charles R. Fulbruge III
Clerk

————

No. 06-51445

————

DONNA JORDAN

Plaintiff-Appellee

v.

ECTOR COUNTY; JANIS MORGAN, individually
and in her official capacity as Ector County District Clerk

Defendants-Appellants

————

Appeal from the United States District Court
for the Western District of Texas

————

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Donna Jordan brought suit under 42 U.S.C. § 1983 against Ector County and Janis Morgan (Defendants), the Ector County District Clerk and her former boss, alleging that Morgan fired her in retaliation for her exercise of her First Amendment rights. The case went to trial; the jury found for Jordan and awarded her damages. We affirm.

I

When the longtime Ector County District Clerk decided against seeking reelection in 2002, two employees in the Clerk's office, Jordan and Morgan, ran for the office. Morgan won. Jordan did not quit her job in the Clerk's office following the election nor did Morgan fire her. However, Morgan did demote

Jordan from Chief Deputy to Assistant Chief Deputy. Jordan held the position of Assistant Chief Deputy until Morgan fired her in 2005.

Jordan's first official problem occurred in August 2004. At the request of an attorney and without receiving the judge's permission, Jordan "held" a signed order prior to it being "scanned" and used Wite-Out to remove the corresponding docket sheet entry; Jordan intended to tell the judge but went home ill before doing so. The judge discovered what had happened, and complained to Morgan, who discovered that Jordan was responsible. Morgan reprimanded Jordan for the incident.

The incident that precipitated Jordan's termination occurred in March 2005. A state's attorney needed to have an order signed quickly, but the case file was locked in the office of the judge who had been involved in the earlier incident. Jordan asked a security guard whether he could open the judge's office; he did, and Jordan retrieved the file. The judge was upset that Jordan had entered her office without permission and complained to Morgan.

After a meeting among Jordan, Morgan, and the County's Human Resources Director, Morgan fired Jordan. The Notice of Employee Separation form had boxes for "violations of co. rules/policies" and "dishonesty—falsified co. records" marked, and the comments corresponding to those boxes stated, respectively, "violation of standards and rules of District Clerk's office" and "altering county records." No other person was disciplined over the incident, nor was the incident reported to the superiors of the other persons involved.

This all occurred against the backdrop of the looming 2006 Clerk's election; however, Jordan never explicitly told anyone she was going to run. Rather, she offered an ambiguous response to those who asked, stating that if her husband had anything to do with it, she would run. Those in the office, including Morgan, assumed that Jordan would run again. Morgan admitted in her testimony that

she thought it would be "easier" to run against a disgruntled former employee. After being fired, Jordan decided against running.

Jordan filed suit under 42 U.S.C. § 1983 against Defendants alleging violations of her First Amendment rights, equal protection, and due process. The due process claim was dismissed before the July 2006 trial. The district court granted a directed verdict on Jordan's equal protection claim, but denied the same on the First Amendment claim. The jury found for Jordan on the First Amendment claim, awarding $64,000 in damages. Defendants appeal.

II

The parties dispute what standard of review applies. Jordan argues that "plain error" review applies because Defendants' notice of appeal states that they are appealing "the final judgment" and not specifically the denial of Defendants' motion for judgment as a matter of law.

Federal Rule of Appellate Procedure 3(c) states that "the notice of appeal must designate the judgment, order, or part thereof being appealed." Where a notice of appeal lists "particular orders only (and not the final judgment), we are without jurisdiction to hear challenges to other rulings or orders not specified in the notice of appeal."[1] However, where the notice of appeal is from a final judgment, "we have held that an appeal from a final judgment sufficiently preserves all prior orders intertwined with the final judgment."[2] Even where a party errs in "designat[ing] the ruling from which he seeks to appeal, the notice of appeal is liberally construed and a jurisdictional defect will not be found if (1) there is a manifest intent to appeal the unmentioned ruling or (2) failure to designate the order does not mislead or prejudice the other party."[3]

---

[1] Trust Co. of La. v. N.N.P., Inc., 104 F.3d 1478, 1485 (5th Cir. 1997).

[2] Id.

[3] Id. at 1486.

The district court's ruling on Defendants' motion for judgment as a matter of law is intertwined with the final judgment. Jordan cannot claim surprise, let alone prejudice, as the issues on appeal are identical to those contested at trial and that were raised in Defendants' motion.

Thus, we review de novo the denial of Defendants' motion for judgment as a matter of law.[4] "'A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict.'"[5] The motion should only be granted if "'the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict.'"[6] "If reasonable persons could differ in their interpretation of the evidence, then the motion should be denied."[7] We view the evidence, and draw all reasonable inferences, in the light most favorable to the verdict; however, a "mere scintilla" of evidence is insufficient to sustain a jury verdict.[8]

## III

It is now a rote principle of constitutional law that "public employees do not surrender all their First Amendment rights by reason of their employment."[9] Jordan alleged that she was unlawfully fired in retaliation for exercising her First Amendment rights. In order for a public employee to prevail on a First Amendment retaliation claim, she must prove that (1) she suffered an adverse employment decision; (2) she was engaged in protected activity; and (3) the

---

[4] Allstate Ins. Co. v. Receivable Fin. Co., LLC, 501 F.3d 398, 405 (5th Cir. 2007).

[5] Id. (quoting Hiltgen v. Sumrall, 47 F.3d 695, 699 (5th Cir. 1995)).

[6] Id. (quoting Pineda v. United Parcel Serv., Inc., 360 F.3d 483, 486 (5th Cir. 2004)).

[7] Thomas v. Tex. Dep't of Crim. Justice, 220 F.3d 389, 392 (5th Cir. 2000).

[8] Allstate Ins. Co., 501 F.3d at 405.

[9] Garcetti v. Ceballos, 126 S. Ct. 1951, 1957 (2006).

requisite causal relationship between the two exists.[10] The parties stipulated at trial that Morgan was acting under color of state law when she fired Jordan; and, there is no question that termination of employment qualifies as adverse employment action.[11] Defendants argue that Jordan fails on the second and third elements.

## A

Defendants raise two bases for arguing that Jordan failed to prove she was speaking on a matter of public concern. First, they argue that she was not engaged in protected activity when she was fired. Second, they argue that, in substance, Jordan is not seeking to defend recognized First Amendment rights but rather is masquerading a "fundamental right to candidacy" claim in First Amendment clothing.

The Supreme Court's jurisprudence creates a constitutional two-step for determining whether the First Amendment protects a public employee's speech. First, the employee's speech needs to address a matter of public concern.[12] In evaluating whether speech is on a matter of public concern, we examine the "content, form, and context of a given statement, as revealed by the whole record,"[13] to determine whether the plaintiff "[spoke] primarily in his role as a citizen rather than as an employee addressing matters only of personal

---

[10] See Hitt v. Connell, 301 F.3d 240, 246 (5th Cir. 2002); Beattie v. Madison County Sch. Dist., 254 F.3d 595, 601 (5th Cir. 2001); Pierce v. Tex. Dep't of Criminal Justice, 37 F.3d 1146, 1149 (5th Cir. 1994).

[11] See Rankin v. McPherson, 483 U.S. 378, 383 (1987); Brady v. Fort Bend County, 145 F.3d 691, 702 (5th Cir. 1998).

[12] See Garcetti, 126 S. Ct. at 1957 ("[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.").

[13] Connick v. Myers, 461 U.S. 138, 147-48 (1983).

concern."[14]  Even if an employee is speaking on such a matter, the court must engage in Pickering-Connick balancing.[15]

We must also consider the First Amendment political affiliation jurisprudence. "For more than two decades, the Supreme Court has consistently held that 'the First Amendment forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved.'"[16]  "Although the Supreme Court's decisions involve party affiliation, our Circuit has recognized that 'the Elrod-Branti doctrine applies when an employment decision is based upon support of and loyalty to a particular candidate as distinguished from a political party.'"[17] "In these cases, the employees' political support of the defendant's political rival raised the concern that the employees' termination was based on the employees' political loyalties."[18]

---

[14] Fiesel v. Cherry, 294 F.3d 664, 668 (5th Cir. 2002); see Connick 461 U.S. at 147.  As we have observed, cases in this circuit, especially in mixed-speech cases, have often viewed these as separate tests, relying on one or the other or the two in combination.  See Stotter v. Univ. of Tex. at San Antonio, 508 F.3d 812, 826 (5th Cir. 2007).  We need not wade into this issue as it does not affect the outcome here, if it ever does. See id. 826 n.4 ("In fact, we have been unable to find a single case in which the application of these varying tests brought the panel to different conclusions.").

[15] Brady, 145 F.3d at 704.

[16] Id. at 702 (quoting Rutan v. Republican Party of Ill., 497 U.S. 62, 64 (1990)); see Branti v. Finkel, 445 U.S. 507 (1980); Elrod v. Burns, 427 U.S. 347 (1976).

[17] Correa v. Fisher, 982 F.2d 931, 935 (5th Cir. 1993) (quoting McBee v. Jim Hogg County, 703 F.2d 834, 838 (1983), vacated on other grounds 730 F.2d 1009 (1984) (en banc)); see also Gentry v. Lowndes County, Miss., 337 F.3d 481, 485 n.4 (5th Cir. 2003) ("In this circuit's political patronage firing cases, the inquiry focuses on 'support of and loyalty to a particular candidate as distinguished from a political party.'"); Wiggins v. Lowndes County, Miss., 363 F.3d 387 (5th Cir. 2004) (upholding jury verdict on political affiliation/patronage retaliation theory where public employee campaigned for his brother against his boss).

[18] Correa, 982 F.2d at 935.

Recognizing that these variations in First Amendment cases cannot be easily cabined, "this court has concluded that factual scenarios in which government employers discharge employees based upon their political affiliation, their exercise of their right to free expression, or some combination thereof 'locate themselves on a spectrum.'"[19] This spectrum guides the application of Connick-Pickering balancing.[20]

The evidence developed at trial reveals two potential wellsprings of protected First Amendment activity: Jordan's campaign for District Clerk in 2002 and her potential candidacy in 2006. We begin with the latter.

Standing alone, an unexpressed desire to run for office in 2006 would not trigger First Amendment protections. This is not to say that silence is never protected, of course, because "'[s]peech,' as we have come to understand that word when used in our First Amendment jurisprudence, extends to many activities that are by their very nature nonverbal."[21] But, whatever its source, there must be some outward manifestation of the allegedly protected First Amendment activity; a defendant's assumptions and bad motives, standing alone, do not create First Amendment liability.[22] Defendants contend that this

---

[19] Brady, 145 F.3d at 704 (quoting McBee, 730 F.2d at 1014); see also O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 719 (1996) ("A reasonableness analysis will also accommodate those many cases . . . where specific instances of the employee's speech or expression, which require balancing in the Pickering context, are intermixed with a political affiliation requirement. In those cases, the balancing Pickering mandates will be inevitable.").

[20] See Brady, 145 F.3d at 704 ("In circumstances falling between these two polar extremes, we have concluded that Connick/Pickering balancing constitutes the appropriate inquiry.").

[21] Steadman v. Tex. Rangers, 179 F.3d 360, 367 (5th Cir. 1999).

[22] See id. at 368 ("By never saying anything, [plaintiff] may only rely on the Supreme Court's political association jurisprudence to anchor her First Amendment claim. Unfortunately for her case, this foothold is decidedly narrow because [plaintiff] never produced any evidence showing an outward sign of her membership in a feminist organization or support–even tacit support–of a feminist agenda. Notwithstanding the fact that [defendant] thought she was a member of a political organization that he disdained and that [plaintiff]

is the problem Jordan faces in general, and in particular as to the 2006 election. As they note, Jordan testified that "I don't recall ever directly stating to anyone that I was going to run," and when asked if she was going to run again, Jordan would reply, "If my husband has anything to do with it, I would." If an unexpressed intent to run in 2006 was the lone basis of protected activity, Defendants' argument would be compelling, but such is not this case.

Jordan's run for District Clerk in 2002 involved protected First Amendment activity across multiple planes. Although Defendants are correct that the record contains little in the way of specifics of Jordan's campaign or positions, Jordan's allegation was not that she was fired because of any particular policy position or single campaign event, but rather because of her campaign for office as a whole. It is beyond question that Jordan ran for the office, engaged in campaign activities, and was Morgan's political rival.

In Click v. Copeland, we considered whether two deputy sheriffs' political activity – running for their boss's elected office – involved protected conduct. The Sheriff transferred the deputies from their job assignments, which they argued was a retaliatory demotion. In considering the Sheriff's qualified immunity claim, we passed on whether the deputy sheriffs' conduct fell within the protective curtilage of the First Amendment:

> It is undisputed that Click and Falcon's conduct, running for elected office, addressed matters of public concern. Thus, this case, like Matherne, McBee, and Connick, falls somewhere in the middle of the McBee spectrum. It follows that Sheriff Copeland was required to engage in McBee-Pickering-Connick balancing before taking disciplinary action against Click and Falcon because of their political activity.[23]

---

never denied these political beliefs, we cannot simply allow the case to proceed past summary judgment on the theory that [defendant's] actions on their face were an attempt to violate [plaintiff's] First Amendment rights. [Defendant's] bad motive alone is insufficient under our case law to establish a First Amendment claim.").

[23] 970 F.2d 106, 112 (5th Cir. 1992).

We have reiterated since Click that a public employee's campaign activities address matters of public concern.[24] Our case law, therefore, supports the conclusion that Jordan's 2002 run for office involved matters of public concern.

Moreover, the 2002 election also involved political affiliation because Jordan was Morgan's electoral opponent; that is, this is a case where a public employee suffered adverse employment action because she supported her boss's political rival.[25] Jordan was not a policymaker; her job did not require political affiliation. By running against Morgan, Jordan was explicitly not demonstrating "support" and "loyalty" to Morgan.

What is critical in this case is that Jordan's candidacy in 2002 and her attendant political affiliation as Morgan's rival breathe fresh life into the 2006 election as a source of protected political activity. That is, we cannot view the different sources of political activity as isolated events that are unknown to each other and operating independently. While Jordan did not trumpet her continued political rivalry with Morgan during the intervening years or positively declare her intent to run for office in 2006, there were signals, however subtle, that she continued to be and would be Morgan's political rival. Viewing the studied ambiguity in Jordan's response to inquiries as to whether she would run again in 2006 under the circumstances as a whole, leads us to conclude that when Jordan was fired, she is properly understood to have been Morgan's political opponent. That is, there were "outward signs" of Jordan's political affiliation. Thus, she was within the reach of the First Amendment.

---

[24] See, e.g., Wiggins, 363 F.3d at 390 ("Political speech regarding a public election lies at the core of matters of public concern protected by the First Amendment."); Aucion v. Haney, 306 F.3d 268, 274 (5th Cir. 2002) ("There is no doubt that campaigning for a political candidate relates to a matter of public concern."); Vojvodich v. Lopez, 48 F.3d 879, 885 (5th Cir. 1995) ("there can be no question that the claimed activity, associating with political organizations and campaigning for a political candidate related to a matter of public concern").

[25] See, e.g., Wiggins, 363 F.3d at 389.

Defendants also argue that Jordan is in essence claiming a "fundamental right to candidacy," a right which they say has never been recognized. The "right to candidacy" cases often involve a ballot access or front-end restriction on a person's ability to run for public office,[26] and sometimes specifically grapple with policies that regulate public employees' ability to run.[27] But, here there was no policy that impeded Jordan's candidacy, nor was she fired for violating any such policy.[28] Defendants' reliance on cases from other circuits, the most significant of which is Carver v. Dennis,[29] holding that a public employee's mere announcement of candidacy is not protected by the First Amendment is misplaced. Assuming that these cases do not conflict with Supreme Court precedent and our case law, the instant case is distinguishable because of Jordan's protected activities in 2002 and the continuing political affiliation;

---

[26] See, e.g., Clements v. Fashing, 457 U.S. 957 (1982).

[27] See, e.g., Brazil-Breashears v. Bilandic, 53 F.3d 789 (7th Cir. 1995).

[28] The only political activities policy promulgated by the County that the parties point to provides: "The County encourages all of its employees to participate in the political process or political affairs, to take an active interest, but they may not identify themselves as representatives of the County in any political activity or involvement nor in any letter to a newspaper or magazine. Employees who are themselves elected officials will be governed by state laws regarding their political activities. During any election employees are encouraged to exercise their civic responsibility to vote."

[29] 104 F.3d 847 (6th Cir. 1997) ("In sum, we hold that no reading of the First Amendment required Dennis to retain Carver after Carver announced her intention to run against Dennis for Dennis's office."); see also Burleson v. Colbert County-N. Ala. Healthcare Auth., 221 F. Supp. 2d 1265 (N.D. Ala. 2002) ("The announcement of Burleson's candidacy, standing alone (i.e., with no evidence of partisanship or opposition to Burleson's candidacy or his platform), does not present a clearly established constitutional right."). Defendants protest that Click did not decide whether "candidacy alone" is protected conduct; as this is not such a case, we do not pause on whether Click should be so interpreted.

Carver itself suggests that such facts would take a case out from its reach.[30] The "right to candidacy" argument does not persuade here.

We emphasize the particular circumstances of this case. The interplay of the 2002 election, the political rivalry, and the 2006 election make this case unique. To recognize that the First Amendment operates in these circumstances is not to hold that the First Amendment conferred on Jordan a protected status that lingered in perpetuity, as Defendants contend.[31] Nor is it to hold that the First Amendment protects beliefs, affiliations, or speech that have not been expressed, communicated, or manifested. It is rather to give heed to the "the oft repeated warning that because of the wide variety of situations in which this issue might arise, each case should be considered on its particular facts."[32]

Because Jordan's activity involved a hybrid of speech and affiliation, we turn to Connick-Pickering balancing.

B

Pickering-Connick balancing requires us to consider the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees."[33] "[T]he state's burden in justifying a particular discharge varies depending upon the

---

[30] The court in Carver commented that, to recognize First Amendment protection "on the facts of this case, would be to read out of the entire line of relevant Supreme Court precedent the factual requirements of political belief, expression and affiliation, partisan political activity, or expression of opinion, and to read into that precedent a fundamental right to candidacy." 104 F.3d at 853.

[31] See Correa, 982 F.2d at 935 ("Because there was no political rivalry between Fischer and the former County Attorney, the office staff's loyalty to the former County Attorney does not represent the kind of political loyalty that the First Amendment protects.").

[32] Vojvodich, 48 F.3d at 885.

[33] Connick, 461 U.S. at 142 (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)).

nature of the employee's expression."[34] "The more central a matter of public concern the speech at issue, the stronger the employer's showing of counter-balancing governmental interest must be."[35] We consider, inter alia,

> (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity may be characterized as hostile, abusive, or insubordinate; (5) whether the activity impairs discipline by superiors or harmony among coworkers.[36]

We need not pause long on the balancing, for there is no record evidence that Jordan's political activities caused disruptions that would justify termination;[37] Defendants concede the evidence of disruption is "scant." Jordan's political activities constitute core First Amendment activity, and there is no evidence that any campaigning or electioneering occurred at work or on County time. Morgan testified that Jordan was helpful, honest, hard working, and capable. The purported incidents leading to Jordan's termination bore no relation to any of Jordan's political activities – indeed, Defendants maintain Jordan was not fired because of her political activities. As the Tenth Circuit aptly noted, "If there has been no actual disruption justifying termination during the six months following an employee's protected speech, it is nonsensical to rely

---

[34] Id. at 150.

[35] U.S. Dep't of Justice v. FLRA, 955 F.2d 998, 1006 (5th Cir. 1992) (quoting Coughlin v. Lee, 946 F.2d 1152, 1157 (5th Cir. 1991)).

[36] Brady, 145 F.3d at 707.

[37] See Vojvodich, 48 F.3d at 887 (explaining "that, regardless of whether an employee is a policymaker, a public employer cannot act against an employee because of the employee's affiliation or support of a rival candidate unless the employee's activities in some way adversely affect the government's ability to provide services").

ex post on a 'prediction' of disruption to tip the balance in favor of an employer's interest in an efficient workplace."[38]

C

Next, we consider whether there was sufficient evidence for a reasonable jury to conclude that Jordan's protected activity was a "substantial or motivating" reason for her termination. Defendants' argument is simple if multifaceted: there was no evidence. In a case where much turns on the witnesses' credibility, we must be mindful of our role, which is not to ask whether we would have reached the same conclusion as the jury, but rather to ask whether a reasonable jury could have reached the same result.[39] We conclude that a reasonable jury could conclude that either Jordan's run for office in 2002 or her continuing political affiliation as Morgan's rival, or some combination thereof, was a substantial or motivating reason for her termination.

A reasonable jury could conclude that the reasons given for Jordan's termination were pretextual. Other employees, including the previous Clerk, engaged in similar conduct without being disciplined. Defendants placed great stock on Jordan's conduct violating office policy, yet there were no formal policies in place regarding the conduct for which Defendants claim Jordan was terminated. And, the judge involved in both incidents testified that she never told Morgan that she could not work with Jordan or that Jordan should be fired.

The testimony indicates that the political relationship between Morgan and Jordan was on Morgan's mind when she fired Jordan and, of course, that relationship was rooted in the 2002 election; Morgan admitted that it would be easier to run against a "disgruntled" former employee in 2006. Jordan had never

---

[38] Kent v. Martin, 252 F.3d 1141, 1146 (10th Cir. 2001).

[39] See Hiltgen v. Sumrall, 47 F.3d 695, 699 (5th Cir. 1995) ("Even though we might have reached a different conclusion if we had been the trier of fact, we are not free to reweigh the evidence or to re-evaluate credibility of witnesses.").

disclaimed her political affiliation as Morgan's rival, and her response to question about whether she would run again, considered on these facts, is a reasonable basis for a jury to conclude that Jordan continued to be Morgan's political rival. The Director of Human Resources, for example, warned Morgan before she fired Jordan that she must not let the political relationship lead her to treat Jordan differently than she would other employees.

Other evidence creates a tenuous but viable causal connection between 2002 and Jordan's termination. For example, Morgan demoted Jordan immediately after the election, and Jordan did not receive a pay raise in 2003. Morgan asked that Jordan remove a sticker from a doll on her desk that said "I want to be District Clerk." Morgan singled Jordan out in other subtle ways, notably Morgan made journal entries regarding Jordan on her home computer that were not made part of Jordan's personnel file. The jury viewed these incidents through the prism of Morgan and Jordan's relationship: Jordan was not simply affiliated with Morgan's political rival, Jordan herself was the rival – a rivalry Morgan admittedly had not forgotten.[40]

This is not a case where the only evidence is the sequence of events or a plaintiff's subjective belief. While Defendants made much of the length of time between 2002, 2006, and Jordan's termination, they fail to understand that the First Amendment can protect against distant retaliation; setting aside statute of limitations issues, the length of time is probative of causation,[41] but it is not alone determinative. Morgan's conduct following the 2002 election left a trail of breadcrumbs, albeit circumstantial, that would allow a jury to conclude there was a pattern of hostility towards Jordan rooted in the 2002 election, Jordan's

---

[40] See Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1424 (5th Cir. 1997) ("We therefore find it difficult to believe that any of the Appellants would retaliate against an employee whose protected speech did not adversely affect them in any way.").

[41] See id. at 1424 n.7 ("This lengthy lapse of time, when coupled with the lack of other evidence supporting Brady's case, suggests that a retaliatory motive was highly unlikely.").

continued political affiliation, and the coming political rematch;[42] in other words, that Morgan harbored a retaliatory motive based on Jordan's protected conduct that led her to fire Jordan.

D

Although the causation question is often presented as a single inquiry, the Supreme Court has previously framed it as having two parts,[43] and the jury was instructed to answer both. The first, discussed above, asks whether the protected conduct was a "substantial or motivating" factor in the employer's decision. The second asks whether the employer would have fired the employee regardless of the protected conduct. The second question is much easier here than the first. However plausible, even compelling, the proffered justifications for firing Jordan sound in isolation, the evidence that others had engaged in conduct similar to Jordan's without being disciplined is sufficient for a reasonable jury to conclude that Morgan would not have taken the same action in the absence of the protected conduct.

AFFIRMED.

---

[42] See id. at 1424 (explaining that a plaintiff pursuing a First Amendment retaliation claim "may also rely upon 'a chronology of events from which retaliation may plausibly be inferred'" (quoting Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995))).

[43] See Mt. Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).