# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————

No. 14-10379

—————

MICAH B. PHILLIPS,

Plaintiff - Appellant

v.

CITY OF DALLAS,

Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

March 27, 2015

Lyle W. Cayce
Clerk

——————————————

Appeal from the United States District Court
for the Northern District of Texas

——————————————

Before STEWART, Chief Judge, and SOUTHWICK and COSTA, Circuit
Judges.

CARL E. STEWART, Chief Judge:

In 2011, Micah Phillips—then a 12-year veteran of the Dallas Fire Department—announced his candidacy in the Democratic primary for a seat on the Dallas County Commissioners Court. At that time, city laws prevented city employees from seeking office in any county overlapping the city of Dallas (as Dallas County does). The City subsequently terminated Phillips for violating those laws. In this suit, dismissed on the pleadings by the district court, Phillips challenges those laws both facially and as applied to him. We AFFIRM.

No. 14-10379

## I. Factual and Procedural Background

Micah Phillips ("Phillips") began working for the Dallas Fire Department in April 1999. He was working as a fire dispatcher when, in December 2011, he announced his candidacy for the Dallas County Commissioners Court. The city of Dallas (the "City") notified Phillips on January 23, 2012, that he had violated the Dallas City Charter and the Dallas City Code of Ethics by "fail[ing] to forfeit [his] position with the City after becoming a candidate for Dallas County Commissioner." Two days later, the City formally discharged him.

The provision of the Dallas City Charter under which the City terminated Phillips states: "If any employee of the city becomes a candidate for nomination or election to any elective public office within Dallas County . . . the employee shall immediately forfeit his or her place or position with the city." Dallas City Charter, Ch. 3, § 17(c).[1] The ethics provision, interpreting § 17(c), limits its application to partisan office-seekers and further implements that section. It states that an "employee of the city immediately forfeits employment with the city if the employee . . . becomes a candidate for nomination or election in a partisan election for public office within a county in which the city of Dallas resides . . . ." Dallas Code of Ethics, § 12A-10(b).[2]

---

[1] The applicable Dallas City Charter provision reads, in full, as follows: "If any employee of the city becomes a candidate for nomination or election to any elective public office within Dallas County; or elective public office in another county within the state, having contractual relations with the city, direct or indirect; or any elective public office that would conflict with his or her position as an employee of the city, the employee shall immediately forfeit his or her place or position with the city."

[2] The applicable Code of Ethics rule reads, in full, as follows: "An employee of the city immediately forfeits employment with the city if the employee: (A) becomes a candidate for election to the Dallas city council; (B) becomes a candidate for nomination or election in a partisan election for public office within a county in which the city of Dallas resides, or in a partisan election for a public office, the constituency of which includes all or part of a county in which the city of Dallas resides; (C) becomes a candidate for nomination or election to an elective public office where the holding of that office will conflict with the full and proper discharge of the employee's duties with the city; or (D) is a managerial or supervisory city employee and becomes a candidate for nomination or election to an

No. 14-10379

For simplicity, we refer to these laws collectively as "the Charter" or the "City's Charter."

The City denied Phillips's internal appeal, and he subsequently brought this 42 U.S.C. § 1983 suit in federal district court in August 2012, alleging that the City violated his First Amendment rights. The district court, relying primarily on *Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 550–51 (1973) (upholding federal legislation preventing federal executive branch employees from "tak[ing] an active part in political management or political campaigns"), granted the City's Federal Rule of Civil Procedure 12(c) motion for judgment on the pleadings and dismissed Phillips's claims with prejudice.[3]

In this court, Phillips raises three primary issues. He argues that (1) the Charter is unconstitutional as applied to him; (2) the Charter is facially overbroad; and (3) the City is estopped from defending the Charter.

## II. Standard of Review

This court reviews a district court's decision to grant a Rule 12(c) motion for judgment on the pleadings de novo, using the same standards applicable to a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See Gentilello v. Rege*, 627 F.3d 540, 543–44 (5th Cir. 2010). His complaint therefore "must contain sufficient factual matter, accepted as true, to 'state a claim to relief

---

elective public office of an entity having direct or indirect contractual relations with the city that involve the employee's department."

[3] After the district court's decision, the Texas Legislature passed a law that even the City admits preempts the Charter under which Phillips was terminated. *See* Senator Mario Gallegos Act, Tex. Loc. Gov't Code Ann. § 150.041 (West) ("A municipality may not prohibit a municipal employee from becoming a candidate for public office."). The law became effective in June 2013, and the parties agree that it was not retroactive to Phillips's January 2012 termination. Because we ultimately conclude that the overbreadth challenge must fail on the merits, we do not address the City's argument that this challenge is moot in light of the Gallegos Act.

3

No. 14-10379

that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### III. Discussion

The First Amendment to the Constitution provides: "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to assemble." U.S. Const. amend. I. Speech by citizens and government employees on matters of public concern "lies at the heart of the First Amendment." *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014). And while "public employers may not condition employment on the relinquishment of constitutional rights," *id.* (citations omitted), the Supreme Court has acknowledged that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citation omitted).

The test for balancing an employee's claimed speech interest against the government's interests derives from *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). From that case, a two-step analysis emerged: the first requires an inquiry into whether "the employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418. If not, the "employee has no First Amendment cause of action." *Id.* But if the answer is yes, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Lane*, 134 S. Ct. at 2378 (internal quotation marks and citation omitted).

Phillips is not the first nonsupervisory government employee to challenge a legal scheme that limits public employees' political activities. Indeed, there is a long history of similar challenges both in the Supreme Court and in this court, and perhaps an even longer history of laws like the ones at

4

No. 14-10379

issue here. *See* Rafael Gely & Timothy D. Chandler, *Restricting Public Employees' Political Activities: Good Government or Partisan Politics?*, 37 Hous. L. Rev. 775, 776 (2000) ("The creation of an apolitical public service has been a goal of government in the United States almost since the nation's inception.").

The starting point for a modern examination of the political rights of government employees is *United Pub. Workers v. Mitchell*, 330 U.S. 75 (1947), which upheld federal legislation known as the Hatch Act that forbade certain political activities of federal employees,[4] notably taking "any active part in political management or in political campaigns." *Id.* at 78 (internal quotation marks and citation omitted).

That holding was reaffirmed in 1973 by a pair of decisions that form the contemporary jurisprudential backbone of a long line of cases rejecting First Amendment challenges to laws that restrict the political activities of government employees. In *Letter Carriers*, the Court upheld a host of restrictions on the political rights of federal civil servants, including—as relevant here—a restriction preventing them from being "partisan candidate[s] for . . . elective public office." 413 U.S. at 556 & 576 n.21. A companion case, *Broadrick v. Oklahoma*, 413 U.S. 601, 603, 617–18 (1973), upheld against overbreadth and vagueness challenges a state statute that similarly prohibited state employees from, *inter alia*, becoming a "candidate for nomination or election to any paid public office."[5] And in *Wachsman v. City of Dallas*, this court held that "virtually all the numerous restrictions on federal employee

---

[4] The Hatch Act also applied until recently to state and local employees whose positions were paid for even in part by federal funds. *See* S. Rep. No. 112-211, at 3–5 (2012).

[5] The state's attorney general had interpreted the statute to apply only to partisan political activity. *See Broadrick*, 413 U.S. at 617–18.

5

political activity upheld in *Letter Carriers* . . . apply as much to strictly state and local elections and political affairs as to elections for federal office and political activities attendant thereto." 704 F.2d 160, 171 (5th Cir. 1983).

*Letter Carriers* articulated four governmental interests supporting laws limiting public employees' political rights. First, federal employees "should administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party." 413 U.S. at 564–65. To "serve the great end of Government—the impartial execution of the laws— it is essential," the Court recognized "that federal employees, for example, . . . not run for office on partisan political tickets." *Id.* at 565. Second, and relatedly, employees should also not "appear to the public" to be influenced by politics. *Id.* Third, employees "should not be employed to build a powerful, invincible, and perhaps corrupt political machine." *Id.* Finally, these laws serve to protect federal employees, allowing them to be free "from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." *Id.* at 566.

This court has faithfully adhered to *Mitchell* and *Letter Carriers*, repeatedly upholding similar policies, regulations, and statutes against First Amendment challenges. *See Commc'ns Workers v. Ector Cnty. Hosp. Dist.*, 467 F.3d 427, 431–32, 441–42 (5th Cir. 2006) (en banc) (upholding public hospital non-adornment policy as content- and viewpoint-neutral restriction against a carpenter who sought to wear a pro-union lapel button); *Wachsman*, 704 F.2d at 169–75 (upholding provisions in Dallas municipal charter prohibiting city employees from, *inter alia*, circulating petitions or soliciting contributions for city council candidates and soliciting funds or serving as campaign managers in noncity elections); *McCormick v. Edwards*, 646 F.2d 173, 175, 179 (5th Cir. Unit A May 1981) (concluding that noncivil service state employee with no policymaking responsibility could be discharged for active participation—here,

No. 14-10379

among other activities, hosting a fundraising party—in a partisan election campaign); *Morial v. Judiciary Comm'n*, 565 F.2d 295, 301–03 (5th Cir. 1977) (en banc) (upholding canon rule requiring sitting state judges to resign before seeking political office).[6] We turn next to Phillips's challenges.

A. As-Applied Challenge

Addressing Phillips's as-applied challenge to the City's Charter, and adhering to the *Pickering* framework, we consider first whether Phillips's candidacy amounted to speech on a matter of public concern[7] (that is, whether he maintains a First Amendment interest in his candidacy), and second whether that alleged interest is outweighed by the City's interest in limiting its employees' political ambitions.

*Public Concern*

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 134 S. Ct. at 2380 (internal quotation marks and citations omitted). Here, the district court held that "becoming a candidate for political office is within the First Amendment's ambit" and therefore constitutes speech on a matter of public concern. We agree.

---

[6] Other circuits have addressed these challenges similarly. *See, e.g.*, *Otten v. Schicker*, 655 F.2d 142, 143, 145 (8th Cir. 1981) (holding that a police officer who sought nomination for a senate seat overlapping with his police district could lawfully be prevented by police regulation from seeking that seat); *see also Wilbur v. Mahan*, 3 F.3d 214, 219 (7th Cir. 1993) (Easterbrook, J., concurring) ("The Supreme Court has held that, without violating the first amendment, a public body may forbid its employees to run for elective office." (citations omitted)); *Jenkins v. Town of Bryson City*, 946 F.2d 885, at *1–2 (4th Cir. 1991) (unpublished); *cf. Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1269–70, 1271–75 (10th Cir. 1998).

[7] The parties do not dispute that Phillips spoke in his capacity as a citizen rather than as a public employee. *See Garcetti*, 547 U.S. at 421.

No. 14-10379

This court has been unequivocal in its recognition of a First Amendment interest in candidacy. *See United States v. Tonry*, 605 F.2d 144, 150 (5th Cir. 1979) ("There is no question that candidacy for office and participating in political activities are forms of expression protected by the first amendment." (citations omitted)), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998); *see also Click v. Copeland*, 970 F.2d 106, 112 (5th Cir. 1992) ("It is undisputed that [the plaintiffs'] conduct, running for elected office, addressed matters of public concern."); *McCormick*, 646 F.2d at 175 ("It cannot be denied that McCormick, like all citizens, has a constitutionally protected right to actively support, work for and campaign for a partisan candidate for political office or even to run for such office himself." (citations omitted)); *Morial*, 565 F.2d at 301 ("Judge Morial's interest in being free to run for Mayor while retaining his seat on the bench is substantial. . . . This burden, moreover, weighs upon the exercise of an important, if not constitutionally 'fundamental,' right. Candidacy for office is one of the ultimate forms of political expression in our society.").[8]

The City protests that these statements are dicta and that this court has expressly recognized that the issue remains an open question. *See James v. Texas Collin Cnty.*, 535 F.3d 365, 377 (5th Cir. 2008) ("[I]t is unclear that the First Amendment provides a right to run for office that extends generally to government employees . . . ."); *Jordan v. Ector Cnty.*, 516 F.3d 290, 298 n.29 (5th Cir. 2008) ("Defendants protest that *Click* did not decide whether 'candidacy alone' is protected conduct; as this is not such a case, we do not

---

[8] Other circuits have reached similar conclusions. *See Randall v. Scott*, 610 F.3d 701, 714 (11th Cir. 2010) ("[The plaintiff's] decision to run for office enjoys *some* First Amendment protection."); *Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir. 1999) ("[The plaintiff's] political speech—his candidacy for office—undoubtedly relates to matters of public concern."); *Mancuso v. Taft*, 476 F.2d 187, 196 (1st Cir. 1973). *But see Carver v. Dennis*, 104 F.3d 847, 853 (6th Cir. 1997); *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982).

pause on whether *Click* should be so interpreted."). Nonetheless, we hold today, in harmony with those decisions, that candidacy alone constitutes speech on a matter of public concern.

Phillips's announcement that he would seek public office can be "fairly considered as relating to [a] matter of political, social, or other concern to the community." *Lane*, 134 S. Ct. at 2380 (internal quotation marks and citations omitted). As we have stated, "[c]andidacy for office is one of the ultimate forms of political expression in our society." *Morial*, 565 F.2d at 301.

Phillips's candidacy also proved to be "a subject of legitimate news interest." *Lane*, 134 S. Ct. at 2380 (internal quotation marks and citations omitted). There was general news coverage of his campaign. *See Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 189 (5th Cir. 2005) ("[T]he very fact of newspaper coverage [of the issue discussed by the employee] indicates that the public was receptive and eager to hear about [the issue]." (internal quotation marks and citation omitted)); *see also Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 165 (2d Cir. 2006) ("To gauge the community's interest in [the employee's] speech we need only look to the abundant press coverage . . . ."). While news coverage is neither strictly necessary nor sufficient for a determination that speech is of public concern, *cf. Morgan v. Covington Twp.*, 563 F. App'x 896, 903 (3d Cir. 2014), it can be a factor.

Satisfied that Phillips's candidacy touched on a matter of public concern, we next evaluate whether his interests are outweighed by those of the City. *See* 16A McQuillin Mun. Corp. § 45:86 (3d ed. 2014) ("While the right to run for public office is protected by the First Amendment, it is not an absolute right.").[9]

---

[9] That candidacy may not be a "fundamental" right for purposes of the Equal Protection Clause, as the City notes, does not answer the question whether candidacy enjoys some protection under the First Amendment. *See Randall*, 610 F.3d at 711 ("While there is no 'fundamental status to candidacy'

No. 14-10379

## Pickering *Balancing*

"[R]estrictions on the partisan political activity of public employees and officers . . . are constitutionally permissible if justified by a reasonable necessity to burden those activities to achieve a compelling public objective." *Morial*, 565 F.2d at 300 (citations omitted).

Phillips seeks to sidestep the veritable mountain of adverse case law in three primary ways. First, he argues, *Letter Carriers*—which upheld the federal Hatch Act, *see* 413 U.S. at 564—requires narrowly tailoring political restrictions to specific, articulable government interests, a dictate not heeded by the district court. Second, he points to a Texas district court decision employing *Letter Carriers* to hold an earlier version of the Dallas Charter provision at issue here unconstitutional as applied to a Dallas city employee. *See Hickman v. City of Dallas*, 475 F. Supp. 137 (N.D. Tex. 1979). Finally, he contends that his right to associate with the Democratic Party in the primary is threatened by Dallas's Charter.

Phillips's first complaint about the district court's failure to conduct a *Pickering* analysis is better directed to the weight it accorded those interests. The district court explicitly recognized the application of *Pickering* and determined that "[t]he same interests that supported the federal law in *Letter Carriers* can certainly support these laws." Effectively, the district court concluded that *Letter Carriers* had *already* done the job of balancing the interests here and concluded that the government came out ahead. We agree.

Phillips argues that the City (and the district court) could not simply adopt the interests articulated in *Letter Carriers*—as both essentially did—to uphold the Charter. Instead, he contends, the City must put forward specific

---

requiring the 'rigorous standard of review' that is applied in voters' rights cases, there is at least some constitutional right to candidacy." (citation omitted)).

reasons for how his *particular* candidacy has endangered the City's interests.[10] We do not see why this must be so. In upholding the Hatch Act in *Mitchell*, for example, the Court did not require any particularized demonstration that the statute's interests were advanced in that specific case. The Court explained that:

> Congress may have concluded that the [political] activity may promote or retard [a government employee's] advancement or preferment with his superiors. Congress may have thought that Government employees are handy elements for leaders in political policy to use in building a political machine. For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed by Congress to interfere with the efficiency of the public service. There are hundreds of thousands of United States employees with positions no more influential upon policy determination than [the mint roller]. Evidently what Congress feared was the cumulative effect on employee morale of political activity by all employees who could be induced to participate actively. It does not seem to us an unconstitutional basis for legislation.

330 U.S. at 101. *Mitchell* preceded *Pickering* and could therefore conceivably have been limited by *Pickering*'s balancing test. *See Pickering*, 391 U.S. at 568. But *Letter Carriers*—which explicitly reaffirmed *Mitchell*, and similarly did not appear to require a particularized showing, *see* 413 U.S. at 564–66—postdated *Pickering*.

Having justified the City's use of the *Letter Carriers* interests to defend its Charter, we emphasize its holding. There, the Court saw no constitutional

---

[10] On this issue, Phillips focuses our attention on the seeming unfairness of applying the City's Charter to a nonsupervisory employee. But this was precisely the effect of the laws in *Letter Carriers* and *Mitchell*. In *Letter Carriers*, two nonsupervisory mailmen were among the plaintiffs precluded from seeking *any* partisan office. *See Nat'l Ass'n of Letter Carriers v. Civil Serv. Comm'n*, 346 F. Supp. 578, 586 n.1 (D.D.C. 1972) (MacKinnon, J., dissenting), *rev'd*, 413 U.S. 548 (1973). In *Mitchell*, the only plaintiff with standing was a roller at the United States Mint, a position the Court recognized called for "the qualities of a skilled mechanic" and did not "involve contact with the public." 330 U.S. at 101. This argument, therefore, must be rejected.

infirmity in a law that precluded federal government employees from a very broad range of political activity, including (among other political pursuits): raising money for, publicly endorsing, or campaigning for political candidates; serving as an officer of a political club; participating as a delegate in a political convention or running for office in a political party; and writing letters on political subjects to newspapers. *See* 413 U.S. at 551 n.3, 576 n.21. We note that Phillips is not prohibited from participating in any of these activities. But most significantly here, the Court held that a line-level postal worker could be precluded from "[b]ecoming a partisan candidate for, or campaigning for, an elective public office." *Id.* at 576 n.21. It cannot be said that the Court left open the possibility of a successful as-applied challenge to a rule like the City's: Phillips's sphere of permissible political activity dwarfs the corresponding range afforded the mailmen in *Letter Carriers*.

We would reach the same conclusion even if we were to confine our analysis to the candidacy restrictions at issue in *Letter Carriers*, which formed only one limitation in a non-exhaustive list of 18 activities explicitly prohibited by the Hatch Act. *See* 413 U.S. at 576 n.21. While the Hatch Act prohibited seeking partisan political offices at the state, federal, and municipal level, *id.* at 572 n.18, the City's Charter is narrowly drawn to prevent City employees from running for an office in the Dallas metropolitan area or from seeking an office that might create a conflict for the employee. *See* Dallas Code of Ethics, § 12A-10(b).

Phillips next directs us to *Hickman v. City of Dallas*, in which a district court held a prior version[11] of the City's Charter unconstitutional as applied to a nonsupervisory police officer who sought nonpartisan office (a city council

---

[11] The City's Charter was redrafted after *Hickman* to focus exclusively on partisan political activity.

No. 14-10379

position) in another city located in Dallas County. 475 F. Supp. at 139–41. First, *Hickman* dealt with a nonpartisan office (though the court commented that its holding did not hinge on that fact), *id.* at 141, whereas the prohibition here is directed only at partisan office. More importantly, though, *Hickman* is distinguishable because Dallas assuredly has a far greater and more direct reason to regulate its employees' political activities in a county with jurisdictional overlap (here, part of the City lies within Dallas County) than it does in a city with none. In *Wachsman*, we recognized that it is

> unrealistic to assume that politics within the geographical boundaries of a city are divided into completely unrelated watertight compartments of city and noncity politics. . . . Moreover, significant operating relationships frequently exist within the geographical area of a city, between the city government, whether partisan or not, and the county, state, and federal governments. City politics . . . cannot be viewed as wholly divorced from the politics, within the area of the city, of the local, state, and federal governments.

704 F.2d at 171. Accordingly, we do not find *Hickman* relevant here.

Finally, Phillips seeks to recast his right to run for office as one of a right to associate with the Democratic Party in the primary.[12] While the right to associate with a political party is protected, *see Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973), the district court correctly recognized that "[t]he logical consequences of *Letter Carriers* extend to individuals' and groups' associational

---

[12] Relatedly, Phillips argues that the City's Charter violates the rights of voters who seek to associate with him. Phillips lacks standing to pursue claims on behalf of these voters, who are not plaintiffs in this litigation. *See Tarpley v. Salerno*, 803 F.2d 57, 60 (2d Cir. 1986) ("Although the voters do have some community of interest with the candidates, the relationship is not close enough to be viewed as an authorization by the former to the latter to represent the voters in . . . legal proceedings . . . ."). By contrast, the judge-plaintiff in *Morial* who unsuccessfully challenged Louisiana's resign-to-run laws in this court was "joined by thirteen citizen-voters who indicated their support for his candidacy." 565 F.2d at 297; *see also Clements v. Fashing*, 457 U.S. 957, 961 (1982) ("The remaining appellees are 20 voters who allege that they would vote for the officeholder-appellees were they to become candidates.").

13

rights." Simply recharacterizing the right to candidacy claim as one of a right to associate does not alter the ground beneath this case. "Neither the right to associate nor the right to participate in political activities is absolute in any event." *Letter Carriers*, 413 U.S. at 567.

Phillips relies on *Jordan v. Ector Cty.*, 516 F.3d 290 (5th Cir. 2008), which he claims recognizes some political associational rights of government employees. The *Jordan* court addressed a plaintiff who claimed that she had been fired for challenging her superior in an election, not because of any rule limiting government employees' political activity. *See* 516 F.3d at 293, 298–99. The court explicitly distanced itself from cases that "grapple with policies that regulate public employees' ability to run." *Id.* at 298. *Jordan* is therefore inapposite in this context.

Consequently, Phillips's as-applied challenge falls short because "the government had an 'adequate justification for treating [him] differently from any other member of the public' based on the government's needs as an employer." *See Lane*, 134 S. Ct. at 2380 (quoting *Garcetti*, 547 U.S. at 418).

B. Overbreadth Challenge

Phillips next challenges the Charter as overbroad. But just as his as-applied attack fails because of *Letter Carriers*, this facial attack is controlled by its companion case, *Broadrick*, which upheld a far more expansive state statute against an overbreadth challenge. *See* 413 U.S. at 618.

In discussing the Oklahoma statute at issue in *Broadrick*, the Court recognized that "[w]ithout question, a broad range of political activities and conduct is proscribed." *Id.* at 604–05. Here, we need not focus on the entire list of prohibited partisan political activities. For example, one challenged provision held constitutional by the Court read as follows:

> No employee in the classified service shall be a member of any national, state or local committee of a political party, or an officer

> or member of a committee of a partisan political club, or a candidate for nomination or election to any paid public office, or shall take part in the management or affairs of any political party or in any political campaign, except to exercise his right as a citizen privately to express his opinion and to cast his vote.

*Id.* at 603 n.1. Without any indication that *Broadrick* has been overruled, there is simply no way to call the City's far more temperate Charter overbroad without running afoul of binding precedent.

C. Estoppel

In Phillips's final challenge to the Charter, he invokes both collateral estoppel and judicial estoppel against the City. The principle of offensive nonmutual collateral estoppel—the specific collateral estoppel doctrine Phillips appears to be employing—"is that if a litigant has fully and fairly litigated an issue and lost, then third parties unrelated to the original action can bar the litigant from re-litigating that same issue in a subsequent suit." *Gibson v. U.S. Postal Serv.*, 380 F.3d 886, 890 (5th Cir. 2004). As relevant here, it would require that "the issue under consideration [be] identical to that litigated in the prior action." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391 (5th Cir. 1998) (internal quotation marks and citation omitted).

Offensive nonmutual collateral estoppel is inapplicable here because the underlying Charter provision and the Code of Ethics provision interpreting it have changed since *Hickman* to apply only to partisan political activity. In addition, as explained earlier, the *Hickman* plaintiff sought office in another city in Dallas County, *see* 475 F. Supp. at 139, whereas Phillips sought a Dallas County office. The issue litigated in *Hickman* is therefore not the issue the parties are litigating here. "If the legal matters determined in the earlier case differ from those raised in the second case, collateral estoppel has no bearing on the situation." *Comm'r v. Sunnen*, 333 U.S. 591, 600 (1948).

No. 14-10379

Judicial estoppel, by contrast, precludes a "party from assuming inconsistent positions in litigation." *In re Superior Crewboats Inc.*, 374 F.3d 330, 334 (5th Cir. 2004) (citation omitted). Judicial estoppel requires that: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011). In this case, the question is whether the City's position in *Davis v. City of Dallas*, 992 S.W.2d 621 (Tex. App.—Dallas 1999, no pet.), is inconsistent with the position it asserts here. Contrary to Phillips's argument otherwise, there is almost no indication at all about the precise position the City took in *Davis*. And in any case, *Davis* involved the application of a predecessor provision of a different part of the City's Code of Ethics, specifically applicable to City employees who seek a position on the Dallas city council. *See* 992 S.W.2d at 624–25; Dallas Code of Ethics, § 12A-10(b)(2)(A). The City is not estopped here.

### IV. Conclusion

*Letter Carriers* and *Broadrick* remain good law, and *Pickering* balancing in this circuit has time and time again favored governments against First Amendment challenges to laws more far-reaching than the City's here. *See Commc'ns Workers*, 467 F.3d at 431–32, 441–42; *Wachsman*, 704 F.2d at 169–75; *Morial*, 565 F.2d at 301–03. Put simply, the "governmental interest in fair and effective operation of the . . . government justifies regulation of partisan political activities of government employees." John E. Nowak & Ronald D. Rotunda, *Constitutional Law* § 16.52(a) (8th ed. 2010).[13]

---

[13] It is true that rules restricting political rights of government employees have been criticized as imprudent, *see* Jason C. Miller, *The Unwise and Unconstitutional Hatch Act*, 34 S. Ill. U. L.J. 313, 356–57 (2010), and that the federal government along with some states (including Texas) have limited regulation in this area. *See* Hatch Act Modernization Act of 2012, Pub. L. No. 112-230 (limiting Hatch Act's coverage of state and local employees); Senator Mario Gallegos Act, Tex. Loc. Gov't Code Ann. §

No. 14-10379

Phillips has sought remand to develop an allegation of viewpoint discrimination. We think remand would be inappropriate because Phillips has never made such an allegation.

The judgment of the district court is accordingly AFFIRMED.

---

150.041 (West) ("A municipality may not prohibit a municipal employee from becoming a candidate for public office."). But this alone does not signify that these laws present problems of a constitutional dimension.